UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYNE GOLDMAN, *et al*., | Case No.  13-cv-01759-SI |
| Plaintiffs, | |
| v. | **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| SEAWIND GROUP HOLDINGS PTY LTD, *et al*., | Re: Dkt. Nos. 85, 89 |
| Defendants. | |

## INTRODUCTION

This lawsuit is the latest in a series of legal proceedings involving the parties. The saga began in 2007 when plaintiffs entered into a contract with a company called Corsair Marine, Inc. for the construction of a custom-built sailboat. For reasons disputed by the parties, plaintiffs' sailboat was never completed, and over the years the parties have been involved in litigation and arbitration in Vietnam, Singapore, and this Court.  Plaintiffs have obtained default judgments in Singapore, and both sides have initiated proceedings in Singapore that are currently stayed due, in part, to this litigation.  At different times the parties have attempted to settle their disputes by entering into agreements such as the "*Mareva* agreement" and an August 2012 settlement agreement, but unfortunately those efforts subsequently fell apart and became the subject of further litigation, including this lawsuit.

As set forth in this order, the Court grants summary judgment in favor of defendants on all claims alleged in the first amended complaint.  The Court finds that plaintiffs' claim for promissory fraud in executing the *Mareva* agreement is precluded by plaintiffs' failure to rescind that agreement.  The Court also concludes that plaintiffs' claims for breach of the 2007 sales contract and breach of the implied covenant of good faith and fair dealing are precluded by the

United States District Court
Northern District of California

1    *Mareva* agreement, while plaintiffs' claims arising out of an alleged breach of the *Mareva*

2    agreement must, pursuant to that agreement, proceed in Singapore.   In addition, based upon the

3    undisputed evidence, the Court concludes that defendants did not breach the parties' August 21,

4    2012 settlement agreement, and the Court finds that plaintiffs have not raised a triable issue of fact

5    on their conversion claim.

6

7                                          **BACKGROUND**

8    **I.      Factual Background[1]**

9           Plaintiffs, a husband and wife, filed this lawsuit against defendants alleging a breach of

10   contract for the construction of a custom-built sailboat.  Defaulted defendant Paul Koch resides in

11   Vietnam and is the former director of Corsair Marine, Inc.[2] and defendant Corsair Marine Sales

12   Pte Ltd. ("CMSPL").   First Amended Complaint ("FAC") ¶ 5.   Defendant Richard Ward is a

13   citizen of Australia, and is the sole shareholder of defendant Seawind Group Holdings ("SWGH"),

14   an Australian corporation. Ward Decl. ¶ 6 (Dkt. 88).[3] In 2010, Seawind Group Holdings became

15   the sole shareholder of Corsair Marine International Pte Ltd. ("CMIPL"), a Singapore corporation

16   that acts as a holding company.  *Id.* ¶¶ 9, 12. CMIPL is the sole shareholder of Corsair Marine

17   International Co. Ltd. ("CMICL"), a Vietnamese corporation that manufactures sailboats, and

18   Corsair Marine Sales Pte Ltd. ("CMSPL"), a Singapore corporation that sells the boats that

19   CMICL makes.  *Id.* ¶ 9.  Plaintiffs allege that Ward "conducts his personal business activities by

20   and through a variety of entities, including but not limited to Seawind Catamarans Pty Ltd,

21   Shipcove Pty Ltd, Seawind Group Holdings Pty Ltd, and Seawind Catamarans, which are his alter

22   egos."  FAC ¶ 4.

23          In June 2007, plaintiffs entered into a written Sales Contract with dismissed defendant

24   _____

25   [1]  The parties have raised various evidentiary objections.  The Court only rules on those objections
     to the extent this order discusses the evidence at issue.

26   [2]  Plaintiffs voluntarily dismissed Corsair Marine, Inc. from this action on July 11, 2013.  Dkt. 33.

27   [3]  Plaintiffs object that there is no evidence aside from Ward's statement that the various corporate
28   defendants are "corporations" under foreign law.  The Court finds that this issue is irrelevant to the
     resolution of plaintiffs' claims on summary judgment.

Corsair Marine, Inc. to purchase a Corsair 50 catamaran sailboat (a "C50").  Kagay Decl. Ex. B (Dkt. 87-2).  Plaintiffs deposited $520,000 toward the purchase.  Kagay Decl. Ex. C (Dkt. 87-3).  The Sales Contract specified "[d]elivery foreseen as Aug 30th 2008," but the boat was not completed by that date.  Dkt. 87-2 ¶ 25.  In November 2009, in an Addendum, several other corporate entities were added to the Sales Contract, including defendant CMSPL. Kagay Decl. Ex. D (Dkt. 87-4).  Two other C50 sailboats were ordered, by Frank and Lisa Coale, and by Tony Fowler. Ward Decl. ¶ 27 (Dkt. 88).

In 2010, the Australian Seawind group of companies, which manufactures and sells sailboats, became interested in acquiring the Corsair companies' business.  *Id*. ¶¶ 12, 27. However, in September 2010, plaintiffs filed a legal action in Singapore to enforce the 2007 Sales Contract against CMIPL, CMSPL, and CMICL, seeking damages and a worldwide "*Mareva*" injunction to keep these corporations from alienating their assets. FAC ¶ 35, Kagay Decl. Ex. C (Dkt. 87-3). On September 17, 2010, the Singapore court issued the *Mareva*  injunction.  Kagay Decl. Ex. E (Dkt. 87-5).  On October 1, 2010, the Singapore court entered a default judgment against CMIPL and CMSPL in the amount of $969,195.  Kagay Decl. Ex. F (Dkt. 87-6).

The Singapore *Mareva* injunction would have prevented the Seawind group from acquiring the Corsair companies.  Plaintiffs and the Australian corporation Seawind Catamarans Pty Ltd. (a subsidiary of SWGH), entered into a contract known as the *Mareva* Agreement, dated October 6, 2010, addressing the Singapore legal action. Kagay Decl. Ex. G (Dkt. 87-7).  This contract provided that plaintiffs "will stand down the Singapore Court substantive action and advise the Singapore Court to release the worldwide *Mareva* injunction" on certain conditions, including the following:

> (a) The sale of the Corsair Group of Companies to Seawind shall proceed as soon as possible . . . .
>
> (b) The original sales contract[] for [plaintiffs] . . . (as amended by the addendum[] therefor) shall remain in full force and effect. Seawind shall assume full responsibility for the completion of the catamaran[] of Goldman . . . .
>
> (h) Seawind agrees to pay . . . the amount of $US50,000 to Fowler, Goldman and Coale collectively . . . .

(k) Any dispute hereunder shall be dealt with by way of arbitration in Singapore . . . .

(l) On completion of the agreement, . . . Goldman agree[s] that [he] will not pursue any other legal action, or make any further claims, against Seawind or the Corsair Group of Companies . . . except in so far as such legal claims arise from the non performance by any party under this agreement.

*Id.*

The *Mareva* Agreement contemplated that Seawind Catamarans Pty Ltd., SWGH's subsidiary, would acquire the assets of the Corsair companies. *Id.* ¶ 5. An Addendum to the Agreement, also dated October 6, 2010, raised the payment to plaintiffs and the other C50 purchasers from $50,000 to $90,000. Dkt. 87-8 ¶ 2. Seawind Catamarans made this payment. Goldman Depo. 62:16-23, Kagay Decl. Ex. I (Dkt. 87-9). After the lifting of the *Mareva* injunction, SWGH acquired all of the stock of CMIPL and became the indirect owner of CMSPL and CMICL. Ward Decl. ¶ 26 (Dkt. 88).

The October 2010 *Mareva* Agreement provided that Seawind would complete the boats of plaintiffs and Mr. Fowler "within a reasonable time of 6 to 9 months," or by July 2011. Dkt. 87-7 ¶ 9(c). Plaintiffs' boat was not completed by July 2011 for reasons disputed by the parties. On October 25, 2011, plaintiffs' solicitor sent Seawind Catamarans a notice terminating the *Mareva* Agreement and the Sales Contract. Ward Decl. ¶ 41, Ex. M (Dkt. 88-13).

In February 2012, plaintiffs initiated arbitration in Singapore against Seawind Catamarans Pty Ltd., pursuant to the *Mareva* agreement. Ward Decl. ¶ 44 (Dkt. 88). Plaintiffs sought to have Ward and Seawind Group Holdings Pty made parties to the arbitration, but the arbitrator ruled that neither could be added as parties because they were not signatories to the underlying agreement. *Id.*[4]

In August 2012, SWGH entered into administration under Australian law. Administration is a form of bankruptcy under which a company's debts are settled so that it can continue in business. *Id.* ¶¶ 20-21. SWGH's manufacturing subsidiary Seawind Catamarans Pty Ltd., then known as Shipcove Pty Ltd., went into liquidation. *Id.*

---

[4] It is unclear from the parties' papers when the arbitrator made this ruling.

United States District Court
Northern District of California

1   In August and September 2012, plaintiffs entered into a Settlement Agreement and

2   Clarification Addendum with defendants CMICL, CMIPL, and CMSPL. Kagay Decl. Ex. J and K

3   (Dkt. 87-10, 87-11). Those agreements, dated August 21, 2012 and September 5, 2012, provided

4   that the Corsair companies would prepare plaintiffs' partially completed boat for pickup in

5   Vietnam, where it was being built; that plaintiffs would arrange for a barge to pick it up; that "all

6   actions and disputes" between the parties, including the Singapore default judgments and then-

7   pending arbitration, would be settled when the boat left Vietnam waters; and that time was of the

8   essence. *Id.*

9   After the parties executed the September 5, 2012 Clarification Addendum, the parties

10   exchanged a series of e-mails.   On September 6, 2012, Paul Koch, on behalf of defendants, wrote

11   to plaintiffs' solicitor stating, "I have been advised by the Administrator of the Seawind Group

12   that I must withdraw the agreement that I signed" unless he received a letter or addendum making

13   certain statements regarding the pending Singapore arbitration.  Matz Decl. Ex. 32 at JS0248 (Dkt.

14   95-4). After an exchange of several e-mails, on September 7, 2012, plaintiffs' solicitor wrote to

15   Mr. Koch and informed him that "I am instructed by Wayne Goldman to confirm that provided

16   performance of the settlement agreement signed (amended by addendum) proceeds then the

17   Claimant will suspend the application to join Richard Ward and Seawind Group Holdings to the

18   Goldman v[.] Shipcove arbitration. . . .   Kindly confirm by return . . . that this is an end to

19   exchanges and that focus is now entirely on arranging departure of the vessels from Vietnam."

20   Matz Decl. Ex. 34 (Dkt. 95-4).  Mr. Koch responded the same day, "I am happy to confirm that we

21   will move forward as fast as possible to ship the boat. Please advise when and where the ship will

22   be available to load the boat onto it."  *Id.*

23   The parties continued to exchange e-mails regarding implementing the settlement

24   agreement.  In an e-mail dated September 12, 2012, Mr. Ward stated it was "Corsair's intention to

25   immediately fulfill the requirements of the Agreements pending . . . instructions from Goldman

26   regarding the availability of a barge," and that in turn, defendants required confirmation that the

27   Singapore arbitration was suspended and that upon fulfillment of the settlement agreement, all

28   litigation against defendants would be withdrawn and ceased.  Matz Decl. Ex. 35 (Dkt. 95-4).

That same day, Mr. Goldman e-mailed Mr. Koch and CMICL's factory manager James Sganzerla and wrote:

> Hi Paul and James;
>
> Thank you both for facilitating the agreement to have my boat shipped from Vietnam. Although I understand that there [are] still some issues to be resolved with Richard, I am hoping that we can progress on shipping my boat in a timely manner and appreciate your help during these trying and difficult times with Richard.
>
> I have been working on my end to try to arrange shipping and have been having difficulties arranging reasonably pr[i]ced shipping. Is it possible for you to check on your end to see about having my boat shipped to Phuket? Also, it seems advantageous to place all of the loose equipment into a container, rather than into the boat. Could you also check on having a container dropped at your location for loading?
>
> Since it appears that the cost of shipping may be extremely high, I would like to explore the possibility of having you install the engines and steering, windows and doing the bottom paint. That way, I could motor the boat to Phuket and put the money into the engines and steering rather than shipping. I would only want to do what is absolutely necessary to make the boat seaworthy and propel the boat. I would arrange to have the engines and steering shipped to you as soon as possible. Could you give me an estimate of time and cost to do these things?
>
> Again, I greatly appreciate your help and assistance with all of this. Please let me know your thoughts.
>
> Best;
>
> Wayne

Kagay Decl. Ex. K (Dkt. 93-11).

The next day, September 13, 2012, Mr. Sganzerla responded:

> Hi Wayne,
>
> I have had some quotes on shipping and I cannot get the boat shipped from here to Phuket directly the nearest port is Songkhla in Thailand which is on the opposite side of the peninsula. I am not familiar with the port there but I would imagine it could be trucked from there to Phuket. It does not look far on the map. The prices I have gotten to this port are about $23,000.
>
> As far as putting the remaining things into a container is no problem.
>
> As far as making the boat ready to motor away I would need some information first to know where to start. To make the boat motorable we would need engines; batteries; fuel filters; props; engine

controls; cabling; all steering parts; thru hulls and filters for engines; windows; bottom paint.

To motor the boat away, the boat needs to be registered and will need a minimal amount of safety equipment for the authorities to allow the boat to leave. Also I do not know how they will feel about the boat being incomplete so I don't know what they might say but suspect with a little cash money in their pocket they will cooperate.

Can you please indicate what you are providing and what we are to provide other than the labor. The steering I would have thought was better for us to supply as we have the supplier set to make this already.

Regards

James

*Id.*

Mr. Goldman responded on September 20, 2012:

Hi James;

Sorry that I haven't responded sooner. I have been anxiously waiting to see what was going to happen with Richard and Seawind. Considering the current situation, the shipping of my boat is on hold, as I am in discussions with Paul and Richard to try to work something out. I will let you know as soon as I have a clear path forward.

I appreciate your efforts and truly hope that we can have a final resolution to this mess that will allow you and Paul to also make the best of the situation.

Best;

Wayne

*Id.* Later that same day, Mr. Goldman sent Mr. Sganzerla another e-mail:

Hey James;

Just wanted to know if anything has been done to get the boat ready to ship and to get the equipment ready to go into a container. If not, how long will it take to do that? Thanks.

Wayne

*Id.* Ex. M (Dkt. 93-13). The same day, Mr. Sganzerla responded:

Hi Wayne,

Your parts are already packed onto a pallet (I think it is only 1 pallet). The boat furniture has not been packed up yet but I suspect this could be done in a couple of days. Sealing up the boat probably

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> another couple of days. Moving the boat and getting it to port will be the hardest job. It takes about one day to move it to the end of the building and another day to get it out through the doorway. There would be another day to prepare for loading and a 4th day to put it on a truck. Because it is so large it can only travel late at night. So I guess to prepare it and move it in total is probably 1 1/2 to 2 weeks.
>
> Regards
>
> James

*Id*. Defendants have submitted the undisputed testimony of Mr. Sganzerla, in which he states that Mr. Goldman never responded to the questions in his September 13, 2012 e-mail regarding what was needed in order to make the boat motorable.  Sganzerla Depo. at 58:2-19 (Dkt. 87-12).  Mr. Sganzerla also provided the following testimony regarding why, as of September 20, 2012, he had not progressed further with regard to doing the work called for in the August 2012 settlement agreement:

> Well, we had these conflicting e-mails – I don't know whether you call them "conflicting," but there seem to be some suggestion from Wayne that he was considering other options to have his vessel removed. And one of them, of course, we already talked about, having it in a container. And another one was to fit motors and equipment in order to motor the vessel away.
>
> So, obviously, it was not in our interests to put anything in the vessel that was then going to have to be removed and create a huge amount of work, then to move in a different direction.

*Id*. at 65:9-20.

On September 23, 2012, Mr. Ward wrote plaintiffs' solicitor:

> I refer to your letter of demand below relating to the Judgement in Default obtained by your client in October 2010. Action Number S714/2010/A.10.[5]
>
> I refer you to Mr. Goldman & Ms. Scannon's agreement with the Corsair companies of 21st of August 2012 in which Goldman & Scannon have agreed to cease all litigation (including this judgement) on performance of this agreement.
>
> Corsair is waiting on advice from Goldman/Scan and on the provision of a barge to take delivery of the C50 Catamaran as per

---

[5] The letter of demand to which Mr. Ward referred was dated September 3, 2012, which was prior to the parties' execution of the September 5, 2012 Clarification and Addendum to the August 2012 settlement agreement. It is unclear from the record why Mr. Ward responded to this letter of demand on September 23, 2012.

the Agreement. Corsair has advised Goldman that it stands ready to deliver the vessel on receipt of this advice.

I believe this latest letter of demand is further evidence that your Clients have not entered into negotiations with Corsair in good faith as should be required under any negotiations leading to an agreement.

I request that you immediately respond to advise:

1. Do your clients intend fulfilling their latest agreement of 21st of August.

2. If so, please advise details of the provision of the barge under this agreement.

3. Do your clients intend pursuing litigation against Corsair, Seawind & Richard Ward despite this Agreement of 21st of August and your very clear assurances to the contrary to both myself & Mr. Paul Koch, Gen. Director of Corsair.

Regards

Richard Ward

Ward Decl., Ex. G (Dkt. 88-7).

On October 1, 2012, plaintiffs' solicitor e-mailed Ward and Koch and stated:

We attach a letter terminating the 21 August 2012 Settlement Agreement.

We attach hereto your latest draft of a further revised Settlement Agreement. We have made some minor changes. This is a Settlement Agreement that our client would sign. Please confirm with Mr. Ward whether he will do so.

If we are unable to sign off on a Settlement Agreement that Corsair will perform then we are instructed to progress the Shipcove Arbitration, commence a separate arbitration against Seawind Group Holdings, enforce the Singapore High Court Judgement and pursue Mr. Ward personally for misrepresentation. We trust that this will not be necessary. We require a response the close of business Wednesday 3rd of October 2012.

Ward Decl., Ex. H (Dkt. 88-8).   The enclosed letter purporting to terminate the August 2012

settlement agreement stated,

///

///

9

United States District Court
Northern District of California

Dear Sirs,

**Re: Letter of Termination of 21 August 2012 Settlement Agreement**

We refer to the Settlement Agreement between Messrs. Goldman and Corsair Group companies dated 21 August 2012 (amended by addendum dated 5 September 2012).

The terms of the agreement were to be performed pursuant to the addendum "*as expeditiously as possible*" and time for performance was stated to be "*of the essence*".

We have been informed by our client that many of the terms to be performed by the Corsair companies have not yet been performed. It is now 26 days since the addendum was signed. We consider the delay unacceptable and a breach of the requirement to perform the Settlement Agreement as expeditiously as possible, with time being of the essence. We accordingly confirm on behalf of our client Messrs. Goldman that the agreement is hereby terminated because of your repudiatory breach.

We now intend to continue with the on-going arbitration against Ship Cove and to continue with applications to join RW and Seawind Group Holdings. In the event that the arbitrator will not order that they are joined to the present arbitration then we will commence a separate arbitration in Singapore against them. We are also instructed to proceed to enforce the Judgment obtained in the Singapore Court without delay.

*Id.* (emphasis in original).

In 2012, plaintiffs instituted legal action in Singapore to enforce the default judgments against CMIPL and CMSPL. Ward Decl. Ex. I (Dkt. 88-9). In April 2013, CMIPL, CMSPL, and CMICL instituted suit in Singapore against plaintiffs to enforce the August 2012 Settlement Agreement. Ward Decl. Ex. J (Dkt. 88-10). Plaintiffs filed this lawsuit on April 18, 2013. On August 12, 2013 and November 9, 2013, the Singapore court stayed the actions pending before it, in part because of the pendency of this action. Ward Decl. Exs. K and L (Dkt. 88-11, 88-12).

## II.    Procedural Background

On July 3, 2013, defendants moved to dismiss the complaint on numerous grounds.  In an order filed August 29, 2013, the Court granted in part and denied in part defendants' motion.  As relevant to the pending motions for summary judgment, the Court held that (1) plaintiffs' claim for breach of the 2007 Sales Agreement was not precluded by the subsequent *Mareva* agreement

1   because plaintiffs had alleged that the *Mareva* agreement was unenforceable because it was

2   procured by promissory fraud; (2) plaintiffs' claim for breach of the *Mareva* agreement could not

3   proceed in this court because the *Mareva* agreement provided that any breach of contract claim

4   under that agreement is subject to arbitration in Singapore.  Dkt. 50.

5        The FAC asserts seven causes of action: (1) breach of contract – the 2007 Sales Agreement

6   and 2009 Addendum, (2) breach of contract – the 2012 Settlement Agreement, (3) conversion, (4)

7   unfair competition in violation of California Business and Professions Code section 17200, (5)

8   fraud, (6) promissory fraud, and (7) breach of the implied covenant of good faith and fair dealing.

9   The fraud claim is alleged solely against defaulted defendant Koch and thus is not at issue in the

10  parties' cross-motions for summary judgment.[6]

11

12                              **LEGAL STANDARD**

13       Summary judgment is proper if the pleadings, the discovery and disclosure materials on

14  file, and any affidavits show that there is no genuine issue as to any material fact and that the

15  movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).  The moving party

16  bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*

17  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party, however, has no burden to

18  disprove matters on which the non-moving party will have the burden of proof at trial.   The

19  moving party need only demonstrate to the Court that there is an absence of evidence to support

20  the non-moving party's case.  *Id*. at 325.

21       Once the moving party has met its burden, the burden shifts to the non-moving party to

22  "set out 'specific facts showing a genuine issue for trial.'"  *Id*. at 324 (quoting then-Fed. R. Civ. P.

23  56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is

24  some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

25  *Radio Corp*., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be

26  insufficient; there must be evidence on which the jury could reasonably find for the [non-moving

27

28  ---
    [6]  The parties' cross-motions for summary judgment only address plaintiffs' claims, and do not
    address defendants' cross-claims.

United States District Court
Northern District of California

party].'' *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Id.  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).   The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

# DISCUSSION

As an initial matter, plaintiffs contend that the appearing defendants may not litigate this case because dismissed defendant Corsair Marine, Inc. has had its corporate powers, rights and privileges suspended in California pursuant to California Revenue and Taxation Code section 23301. Plaintiffs assert that the appearing defendants are "closely related" to Corsair Marine, Inc., and thus that those defendants may not file their motion for summary judgment or oppose plaintiffs' motion for summary judgment.

The Court finds that plaintiffs have not cited any authority in support of this position, and that the cases plaintiffs rely upon are inapposite. *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc*., 136 Cal.App.4th 212, 218 (2006), and *AMESCO Exports, Inc. v. Associated Aircraft Mfg. & Sales, Inc.*, 977 F. Supp. 1014, 1015 (C.D. Cal. 1997), both hold that if a suspended corporation cannot sue or defend itself, another entity cannot step in and sue or defend on the Corporation's behalf. Here, the appearing defendants are not trying to defend or sue on behalf of Corsair Marine, Inc., but rather are litigating this case on behalf of themselves. Accordingly, the Court DENIES plaintiffs' blanket request to strike defendants' papers and evidence.

///

12

United States District Court
Northern District of California

I.      **First Cause of Action, Breach of the June 15, 2007 Sales Agreement (Against Corsair Companies, Seawind Group Holdings Pty Ltd, and Ward)**

Both parties move for summary judgment on this claim.  Although plaintiffs frame the first cause of action as one for breach of the 2007 Sales Agreement and the November 2009 Addendum, defendants correctly note that much of plaintiffs' motion for summary judgment on this claim is actually premised upon a breach of the *Mareva* Agreement based upon defendants' failure to deliver the boat by July 2011.

Defendants' argument is two-fold:  (1) To the extent plaintiffs' claim is based upon a breach of the 2007 Sales Agreement and the November 2009 Addendum, those claims are precluded by the subsequent *Mareva* agreement; and (2) To the extent plaintiffs' claim is based upon a breach of the *Mareva* agreement, that claim cannot proceed in this court because, as this Court has previously held, claims for breach of the *Mareva* agreement are subject to arbitration in Singapore.

The Court agrees with defendants.  The *Mareva* agreement states:  "The original sales contracts for [plaintiffs] . . . (as amended by addendums thereto) shall remain in full force and effect."  Kagay Decl. Ex. G, ¶ 9(k).  However, this provision was limited by a later provision stating that plaintiffs "agree that they will not pursue any other legal action, or make any further claims, against Seawind or the Corsair Group of companies. . ., except in so far as such legal action [or] claims arise from the non performance of any party under this agreement." Kagay Decl. Ex. G, ¶ 9(l). Thus, although plaintiffs are still entitled to performance of the Sales Contract's provisions, the only legal action they can pursue to enforce that right is for non-performance under the *Mareva* Agreement.  Plaintiffs argue that paragraph 9(l) never came into effect because it only becomes operative "upon completion and delivery of the vessel." Opp. at 33.  However, the Agreement says that restriction on plaintiffs' future legal actions becomes effective "upon completion of the *agreement*." Kagay Decl. Ex. G, ¶ 9(l) (emphasis added).

Plaintiffs also contend that their claims for breach of the Sales Agreement and Addendum are not precluded because the *Mareva* Agreement was procured by fraud.  However, a contract induced by fraud is voidable, but it is not void.  *See Fed. Deposit Ins. Corp. v. Dureau*, 212 Cal. App. 3d 956, 964 (1989); *Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th

13

Cir. 1986).  If a party believes it has been fraudulently induced to enter into a contract, "[i]n order to escape from its obligations the aggrieved party must rescind." *Vill. Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 50 Cal. 4th 913, 921, (2010), quoting *Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal.4th 394, 415 (1996).  Plaintiffs have never rescinded the *Mareva* contract, and to the contrary, they have sued twice to enforce it – once by bringing an arbitration proceeding in Singapore, and once by basing their original Second Cause of Action in this case on the *Mareva* Agreement.

Plaintiffs' only response on this point is to assert that this argument "is unavailing because Defendants rely exclusively on California law even though the *Mareva* Agreement calls for the application of English law." Opp. at 34.  However, neither party has cited English law regarding fraudulent inducement to this Court, and the Ninth Circuit has held that when the parties cite only local law on a point to which foreign law arguably applies, the parties "have acquiesced in the application of that [local] law."  *See Hatfield v. Halifax PLC*, 564 F.3d 1177, 1184 (9th Cir. 2009) ("Under California's choice of law rules, a California court 'will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.'  Although this court could undertake an independent investigation of English law, we are not experts on such law. Moreover, by citing only California tolling law, the parties have acquiesced in the application of that law." internal citation omitted).

Plaintiffs also assert that Ward and SWGH are judicially estopped from arguing that plaintiffs' claim is precluded by the *Mareva* agreement because those defendants took the position in Singapore that they could not be brought into the Singapore arbitration because they were not parties to the *Mareva* agreement. The Court finds that there is nothing inconsistent in defendants' position that they cannot be required to participate in the Singapore arbitration because they are not signatories to the *Mareva* agreement, and their position in this court that plaintiffs' claim for breach of the 2007 sales contract cannot proceed against them because, *inter alia*, those defendants are not signatories to the sales contract, and because the sales agreement was superseded by the *Mareva* agreement.

14

## II.     Second Cause of Action, Breach of August 12, 2012 Settlement Agreement and September Addendum Thereto (Against Corsair Defendants and Mr. Ward)

The FAC alleges that defendants breached the August 21, 2012 settlement agreement and the September 5, 2012 addendum to that settlement agreement.  The FAC alleges,

> Corsair Marine International Co. Ltd., Corsair Marine International Pte Ltd, and Corsair Marine Sales Pte Ltd (and, by extension, Mr. Ward and Mr. Koch) breached these written agreements by failing to as expeditiously as possible, and in an manner that was consistent with their agreement that time was of the essence, secure all equipment and parts that have been fabricated either installed or below deck, failing to close and secure all openings by installing available windows and, for those openings with no windows, covering them with plywood or other waterproof material such that all coverings of openings would be leak proof, securing all openings with locks or other means to prevent unauthorized entry, failing to arrange for a crane to place Mr. Goldman and Ms. Scannon's uncompleted Corsair 50 on a barge, failing to transporting [sic] Mr. Goldman and Ms. Scannon's uncompleted Corsair 50 to the water's edge at a location that is accessible by a barge, failing to arrange for all necessary paperwork to export Mr. Goldman and Ms. Scannon's uncompleted Corsair 50, failing to clear all liens and encumbrances on Mr. Goldman and Ms. Scannon's uncompleted Corsair 50, and failing to supply Mr. Goldman and Ms. Scannon with all drawings, lists, and specifications for the Corsair 50.

FAC ¶ 86.  The FAC alleges that plaintiffs performed all or substantially all of their obligations under the settlement agreement and addendum, and seeks damages for defendants' breach.  *Id.* ¶¶ 87-88.

Defendants move for summary judgment on this claim, contending that defendants did not breach the agreement and addendum.  Plaintiffs did not move for summary judgment on this claim, and their opposition to defendants' motion asserts – contrary to the allegations of the FAC – that the agreement is not enforceable because plaintiffs properly terminated the agreement under Singapore law.[7]  At the hearing on this matter, the Court questioned plaintiffs' counsel about the apparent inconsistency between the theory alleged in the complaint and plaintiffs' position in their summary judgment opposition.  In response, plaintiffs' counsel stated that this claim was amenable to summary judgment, and that plaintiffs now seek a summary judgment ruling that plaintiffs

---

[7] The Court notes that, as with the first cause of action, plaintiffs' theories and claims as presented in their summary judgment papers are different from what is alleged in the FAC.

properly terminated the settlement agreement pursuant to Singapore law and thus that the agreement is unenforceable.[8]  However, plaintiffs did not move for summary judgment on this claim, and plaintiffs' claim as framed in the summary judgment opposition is inconsistent with the allegations of the FAC.

In any event, the Court finds that the undisputed record shows that defendants did not breach the August 21, 2012 settlement agreement and September 5, 2012 addendum, and thus that defendants are entitled to summary judgment on plaintiffs' claim.  The evidence shows that after the parties executed those agreements, Koch stated that he needed to withdraw the agreement unless he received certain assurances regarding the Singapore arbitration.  Although plaintiffs now argue that Koch's September 6, 2012 e-mail was a repudiation of the settlement agreement and addendum, the evidence shows that on September 7, 2012, plaintiffs' solicitor responded to Koch's email by providing the requested assurances and asking for confirmation that the "focus is now entirely on arranging departure of the vessels from Vietnam."  Matz Decl. Ex. 34 (Dkt. 95-4). Although the parties continued to exchange e-mails regarding a possible modification of the settlement agreement, the parties did not agree on a modification and continued to act as if the agreement was in place.  The FAC alleges that defendants breached the settlement agreement and addendum by failing to take various steps to prepare the boat for shipment.  However, the record shows that defendants repeatedly stated their intention to ready the boat to ship.  The evidence is also undisputed that on September 12, 2012, Goldman asked Sganzerla about readying the boat for motoring from Vietnam, a change that would have required significantly different preparations than preparing the boat for shipment by barge, as indicated by Sganzerla's September 13, 2012 response to Goldman.  Dkt. 93-11.  Plaintiffs do not dispute that Goldman never responded to the questions in Sganzerla's September 13, 2012 e-mail.  Instead, Goldman sent Sganzerla several e-

---

[8] Plaintiffs' counsel stated that plaintiffs sought such a ruling because they intended to submit that ruling to the court presiding over the currently-stayed litigation pending in Singapore.

United States District Court
Northern District of California

mails on September 20, 2012, stating that the shipping of the boat was "on hold," and also asking what had been done to ready the boat for shipment (to which Sganzerla responded the same day). Dkt. 93-11, 93-13.   The record does not support plaintiffs' claim that defendants breached the settlement agreement and addendum at any point prior to plaintiffs' October 1, 2012 letter purporting to terminate the agreement.[9]

### III.   Third Cause of Action, Conversion (Against Corsair Defendants and Ward)

Defendants move for summary judgment on plaintiffs' conversion claim.   The FAC alleges that defendants intentionally and substantially interfered with plaintiffs' property by cutting the hull of the boat at the stern, thereby "seriously compromising the integrity of the hull," adding different transoms than the original transoms that were designed, and then attaching these new transoms onto the remaining hull.   FAC ¶ 91.   The FAC also alleges that "to further profit from [plaintiffs'] catamaran without their consent," defendants caused molds to be taken from the hull of the boat.   *Id*. ¶ 92.     The FAC alleges that defendants have interfered with plaintiffs' boat by failing to deliver it despite their demand for its return, and continuing to possess it at a location that is inaccessible.

The elements of a claim for conversion of are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act of disposition of property rights; and (3) damages.   *See Farmers Insurance Exchange v. Zerin*, 53 Cal. App. 4th, 445, 451 (1997).

The Court concludes that plaintiffs have not raised a triable issue of fact on this claim and that defendants are entitled to summary judgment.   Defendants have submitted undisputed evidence of the following:   The first Corsair C50 (the Coales') that was launched experienced steering and balance problems that caused it to "round up" – i.e., head into the wind – in certain

---

[9] Plaintiffs also assert that they learned that shipment by barge was impossible under Vietnam law. However, the only evidence in support of this assertion is Goldman's inadmissible hearsay statement that "In or around August or September 2012, I was told by representatives of shipping companies that, under Vietnamese law, barges are not allowed to transport goods outside Vietnamese waters."   Goldman Decl. ¶ 8 (Dkt. 95-6).

United States District Court
Northern District of California

conditions of high winds and rough seas.  Ward Decl. ¶ 37 (Dkt. 88); Sganzerla Depo. 18:8-18 (Kagay Decl. Ex. L, Dkt. 87-12).  Defendants worked with the designer of the boat,  Reichel Pugh, to correct this problem.  Ward Decl. ¶ 38 (Dkt. 88); Sganzerla Depo. 18:19-19:14 (Kagay Decl. Ex. L, Dkt. 87-12).  Reichel Pugh's solution was to replace the transom and rudder system with a different one, and this was done on all three Corsair C50s, including plaintiffs'.  Ward Decl. ¶ 38 (Dkt. 88); Sganzerla Depo. 40:16-41:9 (Kagay Decl. Ex. L, Dkt. 87-12).

Plaintiffs assert that the modification was "wrongful" because "the evidence shows that the boat could have been fixed by simply moving the dagger boards into the correct position."  Dkt. 95 at 35-36.  However, plaintiffs do not submit any evidence to show that the solution devised by Reichel Pugh was harmful.  The evidence before the Court shows that Ward had CMICL modify the transoms because that was the remedy that the boat designer Reichel Pugh prescribed for the rounding-up problem, and that this type of modification is not uncommon and does not compromise the boat's integrity.  Ward Reply Decl. ¶¶ 4-6 (Dkt. 98); Reichel Depo. 160:1-162:6, Sganzerla Depo. 42:19-45:1 (Kagay Reply Decl. Exs. FF and GG; Dkt. 97-4, 97-5).[10]

In response to defendants' argument that plaintiffs never demanded the return of the boat, plaintiffs assert that "the August 21, 2012 Settlement Agreement was an express demand by Plaintiffs for the return of the boat.  While Defendants seek to blame Plaintiffs for putting the shipping of the boat on hold, the evidence shows it was Defendants that repudiated the agreement . . . and that the shipping was put on hold because the parties could not reach agreement on the additional terms Defendants wanted to impose on Plaintiffs." Dkt. 95 at 36.  However, as discussed above, the Court finds that defendants did not repudiate or breach the August 21, 2012 Settlement Agreement prior to plaintiffs' October 1, 2012 letter purporting to terminate that agreement, and thus plaintiffs cannot rely on that agreement as a "demand" for the return of the boat.

Plaintiffs also argue that under the 2007 Sales Contract, defendants "should have reimbursed Plaintiffs for all sums they had already paid, as they were required to do under the

---

[10] Plaintiffs appear to have abandoned their allegation that defendants committed a wrongful act by having a mold made of the hull.

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

agreement, and then asked Plaintiffs to transfer title back to them." Dkt. 95 at 36-37. However, to the extent that plaintiffs' conversion claim arises out of the 2007 Sales Contract, that claim is either precluded or subject to arbitration as discussed in Section I *supra.*

## IV.    Fourth Cause of Action, Unfair Competition (Against Ward, Corsair Marine Sales Pte Ltd, and Seawind Group Holdings Pty Ltd)

Plaintiffs do not oppose defendants' motion for summary judgment as to the unfair competition claim, Dkt. 95 at 11, and therefore the Court GRANTS defendants' motion for summary judgment on that claim.

## V.    Sixth Cause of Action, Promissory Fraud (Against Ward)

Plaintiffs allege that defendant Ward committed promissory fraud in executing the *Mareva* agreement.  Plaintiffs allege that, when Ward promised plaintiffs he would complete the construction of their Corsair 50 in return for a release of the *Mareva* injunction, he never intended to keep that promise.  FAC ¶¶ 110-115.

The Court agrees with defendants that this claim is legally precluded. A party may not sue in fraud for damages caused by the fraudulent inducement of a contract without first rescinding the contract. *See Vill. Northridge Homeowners Ass'n*, 50 Cal. 4th at 923 ("[T]he plaintiff could not avoid the obligation to return the consideration by 'affirm[ing]' the settlement agreement and seeking damages for fraud"); *Taylor v. Hopper*, 207 Cal. 102, 103 (1929).  As discussed *supra*, plaintiffs have not rescinded the *Mareva* Agreement and instead have affirmed it twice by suing to enforce it, and therefore they cannot sue for promissory fraud.

## VI.    Seventh Cause of Action, Breach of the Covenant of Good Faith and Fair Dealing (Against Ward)

The Seventh Cause of Action alleges that "by and through the use of various corporate entities, and non-existent entities, . . . Mr. Ward ha[s] been able to avoid liability for breach of the Sales Contract." FAC ¶ 118.  In their opposition to defendants' motion for summary judgment,

1   plaintiffs elaborate on this claim: "Here, one of the benefits of the June 2007 Sales Contract is the

2   right, in the event of a breach by the Seller, to be reimbursed for all sums already paid by the

3   Buyer (Matz Decl., Exh. 1, ¶8.3).  It has been years since Defendants breached the Sales Contract

4   by failing to timely and professionally construct Mr. Goldman and Ms. Scannon's C50, and yet

5   their attempts to obtain reimbursement have been frustrated by Mr. Ward." Dkt. 95 at 38.

6          "The implied covenant of good faith and fair dealing is limited to assuring compliance

7   with the express terms of the contract, and cannot be extended to create obligations not

8   contemplated by the contract." *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089,

9   1094 (2004).  "The covenant does not exist independently of the underlying contract." *Molecular*

10  *Analytical Systems v. Ciphergen Biosystems, Inc*., 186 Cal. App. 4th 696, 712 (2010).  The Court

11  finds that for the same reasons that plaintiffs cannot maintain a claim against Ward for breach of

12  the 2007 Sales Contract, plaintiffs cannot maintain a claim against him for breaching the implied

13  covenant of good faith and fair dealing with respect to the Sales Contract.  The *Mareva* agreement

14  provided that "Any dispute hereunder shall be dealt with by way of arbitration in Singapore . . . .

15  [and that] . . .  On completion of the agreement, . . . Goldman agree[s] that [he] will not pursue any

16  other legal action, or make any further claims, against Seawind or the Corsair Group of

17  Companies . . . except in so far as such legal claims arise from the non performance by any party

18  under this agreement."  Kagay Decl. Ex. G (Dkt. 87-7).  Plaintiffs' claim for breach of the implied

19  covenant of good faith and fair dealing is essentially a restatement of the claim for breach of the

20  2007 Sales Contract. Under the terms of the parties' *Mareva* agreement, plaintiffs must seek relief

21  in the Singapore arbitration.  *Cf. Molecular Analytical Systems*, 186 Cal. App. 4th at 712 (where

22  contract contained arbitration clause requiring arbitration of disputes concerning interpretation or

23  enforcement of contract, breach of implied covenant of good faith and fair dealing claim based on

24  same facts as breach of contract claim was subject to arbitration).

25

26                                    **CONCLUSION**

27          For the foregoing reasons, the Court DENIES plaintiffs' motion for summary judgment

28  and GRANTS defendants' motion for summary judgment.

1       In light of the Court's resolution of the motions for summary judgment, the Court finds it

2   unnecessary to reach the questions of alter ego, personal jurisdiction over defendant Ward, the

3   effect of SWGH's Australian liquidation, or whether the August 2012 Settlement Agreement

4   extinguished all of plaintiffs' claims.

5       In addition, the parties are directed to meet and confer regarding what remains to be

6   decided in this case, and to file a joint letter by **February 9, 2015**, informing the Court of the

7   parties' views of whether the March 17, 2015 trial should proceed as scheduled, and if so, what

8   claims remain to be tried.

9       **IT IS SO ORDERED**.

10  Dated:  February 2, 2015

11

12  SUSAN ILLSTON
   United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California